2012 Ark. App. 266

Dan BILLINGSLEY, Appellant

v.

PLANIT DIRT EXCAVATION & CON-
CRETE, INC., and Desjoyaux Pools
of Arkansas, Inc., Appellees.

No. CA 11–1082.

Court of Appeals of Arkansas.

April 18, 2012.

Meredith Wineland, Benton, for appel-
lant.

Brian M. Bowen, Chris H. Stewart, Little Rock, for appellees.

JOHN B. ROBBINS, Judge.

Appellant Dan Billingsley appeals the order of the Saline County Circuit Court after a bench trial that awarded appellee Planit Dirt Excavation and Concrete, Inc.,[1] damages, costs, and attorney's fees for breach of contract. This appeal returns following our dismissal due to lack of a final order from which to appeal. *Billingsley v. Planit Dirt Excavation & Concrete, Inc., and Desjoyaux Pools of Ark., Inc.*, 2011 Ark. App. 449, 2011 WL 2529989. All claims have been resolved with finality by the Saline County Circuit Court upon entry of an order on July 22, 2011, and appellant filed a timely notice of appeal from that order.

As stated in our prior opinion, the parties contracted for the construction of a swimming-pool project on Dan's property. The construction halted after a verbal disagreement between Dan and Planit Dirt's owner, J.R. Randleas, regarding the second of four payments being due. As a consequence, Dan ordered all personnel from Planit Dirt to leave his premises. Planit Dirt filed suit for breach of contract and conversion of property. Dan countersued for breach of contract. After a trial, the judge found that Dan breached the agreement by ordering Planit Dirt off his property, not paying the second installment, and refusing to allow Planit Dirt to complete the contract. Planit Dirt's claim for conversion and Dan's counterclaim for breach of contract were ultimately dismissed with prejudice. The judge awarded Planit Dirt $19,741 in damages, plus court costs and attorney fees, for a total judgment of $21,253.15.

Dan appeals, arguing that the trial court clearly erred by (1) not finding Planit Dirt to have breached the contract, (2) finding that Dan was required to complete his end of the contract upon Planit Dirt's breach, and (3) using an improper measure of damages because Dan should have been refunded his out-of-pocket costs for Planit Dirt's breach. We affirm.

On appeal from a bench trial, we review the findings of the trial court de novo, but we do not reverse unless the findings are clearly erroneous or clearly against the preponderance of the evidence. *Munzer v. Kushner*, 2010 Ark. App. 196, at 4–5, 375 S.W.3d 647, 649–50. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* We give due deference to the trial judge's superior position to determine the credibility of the witnesses and the weight to be accorded to their testimony. *Id.*

The first two points on appeal require us to decide if the trial court clearly erred in finding that Dan, and not Planit Dirt, breached this contract. We cannot say that the trial court clearly erred in so finding, and we are not left with a distinct and firm conviction that a mistake was committed.

Dan met J.R. at a home show in February 2008 and became interested in having J.R.'s company put a pool on his property. Dan and his wife were also building a home on that site. It is undisputed that the parties entered into a written contract

---

1. Desjoyaux Pools of Arkansas, Inc., is also listed as an appellee. J.R. Randleas, the owner of Planit Dirt, was the exclusive dealer in Jacksonville, Arkansas, for Desjoyaux pool products, which were used in Planit Dirt's pool-construction projects. For simplicity's sake, we will refer only to Planit Dirt or Randleas in our discussion as the appellee.

on July 7, 2008, for the construction of a large and "kiddie" swimming pool in Dan's yard for the price of $62,500 plus any add-ons. This was negotiated between Dan and Planit Dirt, operated by J.R. Rand-leas. The contract price was to be paid in four installments: a deposit of $21,875 at signing of the contract, a second payment of $21,875 "due upon delivery of pool kit," a third payment of $12,500 "due upon completion of excavation and setting of walls," and a final payment of $6,250 "or balance of total sale price (including add ons) due upon filter connection."

There were no set construction deadlines in the contract. In fact, the contract provided in part that, "The Contractor [Planit Dirt] shall not be responsible for damage or delay due to inclimate [sic] weather[.]" Further, the contract provided that, "Owner [Dan] must notify the contractor [Planit Dirt] in writing of any discrepancies or detrimental items that need attention, repaired, replaced, cleaned, removed, etc. Contractor must be given an opportunity to make amends for or repair any discrepancies or detrimental items discovered by owner." The first payment was made by check, when the contract was signed at Dan's house.

Planit Dirt placed an order for the large and kiddie pool kits on July 17, 2008. Boxes holding pool-kit parts were delivered to Dan's property. In early September 2008, Dan's wife was informed that the pool kit had been delivered, rendering the second payment due. Payment was not forthcoming. Construction continued, and on September 11, Dan and J.R. met at the construction site and had a heated argument over the second payment. Ultimately, Dan demanded that the construction personnel cease work and leave his property, and he summoned law enforcement to ensure their departure. J.R.'s company did not complete the job.

In a complaint filed in December 2008, Planit Dirt alleged that Dan wrongfully retained the pool kit and breached the contract, resulting in a loss of $30,000 in profit on the job. Planit Dirt sought the lost profit, punitive damages for conversion of pool goods, pre-and post-judgment interest, costs and attorney's fees. Dan filed a general answer, denying Planit Dirt's accusations, and a counterclaim asserting that Planit Dirt prematurely demanded the second payment before delivery of the entire pool kit. Dan asserted that J.R. physically threatened him to remit the second payment, that he incurred additional costs for the completion of the pool project by another contractor, and that Planit Dirt should pay him for breach-of-contract damages, costs, fees, and interest. Planit Dirt filed a general denial to Dan's counterclaim.

Discovery proceeded with depositions and requests for admission. Planit Dirt filed a motion for summary judgment but did not prevail due to numerous remaining issues of fact to be tried. The trial court ordered mediation, but the case eventually went to bench trial in March and June 2010.

Planit Dirt called Julien Bourganel to testify. Julien, a representative for Desjoyaux Pools of France, stated that his company chose J.R. to be the exclusive distributor of its pool products in the Jacksonville, Arkansas area. Julien said that his company offers quality structure and filtration systems for pools and provides its distributors with pricing lists and sample contracts for use with pool-construction customers. Julien explained that his company's pool kit includes a filtration system with pumps and a control box, the walls and hardware, and the stairs and hardware. He was familiar with this particular project and came to assist with installation in September 2008. He said that his com-

pany supplied the pool kit, and he confirmed delivery of the whole kit to J.R. He also confirmed that J.R. was eager to get payment after delivery of the pool kit and before pouring concrete.

Julien added that he was present when J.R. met with Dan seeking payment, that he heard Dan call J.R. "boy" and warn J.R. that he (Dan) could "whip" J.R. He agreed that J.R. called Dan some foul names as well, but he believed Dan started the argument. Julien confirmed that Dan summoned the authorities to make the construction stop and that they left with whatever items remained in and on their construction vehicles. He estimated that they were forced to leave after approximately 40 percent of the work had been completed. He said they had continued to excavate and put up walls before J.R. received any payment on the second installment. He estimated that the pool could have been finished in a week or two and that they were working into the third phase of construction when work stopped.

Planit Dirt employee Dennis Neal testified that he worked on this pool project. Dennis recalled unloading the pool kit when it arrived, and he believed it was the entirety of the kit. He explained that it contained the vast majority of items for the pool. He agreed that the liner was not yet delivered, but he said they were not allowed to get to that part of the construction. Dennis believed the project to be going as planned, and to be about 65 percent complete, until Dan told them to stop. He said that everyone working on the job heard the argument between Dan and J.R., but he specifically heard Dan loudly cussing at J.R., using terms like "boy" and "piece of shit." Dennis said he did not hear J.R. cussing at Dan. Dennis expressed confusion because Dan and his wife had never mentioned dissatisfaction with their work to date.

Another Planit Dirt employee Tom Jones testified that no one complained to him about their work on that pool project before the big argument. Tom described the pool kit as the structure of the pool including the walls and pump, which he said were on site. He said the kit was checked for content at the distribution site and at this construction site. Tom said everything except the diving board and ladders were present, which were not ready to install. Tom corroborated Dennis's testimony about Dan calling J.R. "boy" and threatening that he used to "whoop" guys like J.R. Tom confirmed that Dan refused to allow them to complete the pool project, called the police, and demanded that they leave. Tom opined that Dan had decided before J.R. arrived that day not to complete the pool project.

J.R. testified that he was the owner of Planit Dirt Excavation and Concrete, Inc., and Desjoyaux Pools of Arkansas, Inc. He started Planit Dirt in 1999 and became a licensed dealer for France-based Desjoyaux in 2005. J.R. said he executed this contract with Dan at Dan's home and that Dan or his wife gave him a check for the deposit. He said he told Dan that he had projects in front of Dan's but that they would begin as soon as possible. J.R. said that the pool kit was delivered toward the end of July, but August 2008 was a very rainy month, hampering construction until the first week of September 2008. J.R. said that Dan's brother Roger was in charge of all the construction activity on Dan's property, as told to him by Dan. He said he checked in with Roger periodically, and Roger never complained or asked questions.

He remembered delivering the pool kit, later asking Dan's wife over the telephone for the second installment due, and being told that he was not going to receive any

more money. He said they continued to work in spite of non-payment, and he asked her another time or two over the telephone for that second payment, without any success.

J.R. testified about the day of the argument. He said he was summoned to the work site by his son, who was unable to get Dan to talk to him about the second draw. J.R. arrived, seeking out Dan to discuss the second draw. The men ended up near the construction site, and he recalled Dan responding to the draw request with rage. He said Dan called him "boy" and "piece of shit" several times, very loudly. J.R. told Dan he had asked for payment from his wife, but Dan retorted that he did not like the way J.R. talked to his wife. J.R. told Dan that he had continued work although he was due the second draw; he said that his crew was actually in the third phase of construction. J.R. said he told Dan that he could not control the weather and testified that no one complained about their work as it progressed in September until this particular day. J.R. admitted that after about five minutes of being berated and told he would not be finishing this job, he became upset and responded in anger, using phrases such as "what's the f* * *ing problem" and "if you feel froggy, jump on me."

He said no one asked for an explanation of what was in a pool kit at the contract's negotiation, nor did anyone on Dan's behalf ask to see what was inside the pool kit when it was delivered. He said they were 70 to 75 percent complete, having excavated the hole and installed wall structures, when the construction halted. He said that a few days later he tried to speak to Dan's brother and wife about being allowed to return to finish the job, but "nobody would give me an answer." J.R. said that months later he regained possession of most of the pool-kit parts from Dan's property.

J.R. testified that the pool kit contained the physical wall structure, three filtration units with skimmers, stairs, and panels—the main structure and components necessary to build the pool prior to pouring concrete. He agreed that certain parts of it were not on site, like the diving board and lights, some of which he already had in his inventory, but he said it was not customary to leave all pool components on site until the pool was ready to have those affixed. J.R. verified a one-sheet plaintiff's exhibit with a break-down of costs and a net expected profit of $36,487.80.

Lee Woodall, the contractor Dan hired to complete the pool project, testified that he and his crew finished the job in about two months, after commencing in December 2008. Dan's half-brother Roger Urey testified that Dan had him act as an overseer for all the construction work on Dan's property, and he was present when the pool contract with J.R. was executed. Roger remembered a pool kit being delivered to the site about a week after the hole had been dug, but he believed that "a lot of stuff" was missing. But he also remembered telling J.R. on that September day that Dan's wife was bringing a check to pay him the second installment. Roger agreed that Dan and J.R.'s conversation was "heated," and he claimed to have heard J.R. call Dan a "MF." He did not understand why the two men could not settle the issue when the check was coming. Roger said J.R. later called him to see about finishing the pool job, but Roger told him it was up to Dan and his wife.

One of Dan's hired laborers, Edward Jones, testified that he was present when the argument broke out, and he heard J.R. use "MF" but did not hear Dan using foul language at all. Another of Dan's laborers, Bill Guessman, confirmed hearing the

loud argument, but he did not know how long they had been arguing when he came outside.

Dan's wife, Brenda Billingsley, testified that J.R. did not start working on their pool until the first part of September, and within a day or two, he wanted his second check, for which he called her several times at work. Brenda said she wanted to look over the project to make sure it was actually time for the second payment because she was concerned that not all the needed equipment was present. She described his demeanor on the telephone calls as "agitated," and she told J.R. that it was ultimately up to Dan. She said that by the time she arrived at the project with her checkbook, there were several deputies present. J.R. stopped his truck as he was leaving, telling Brenda that he was really sorry that all this happened. Brenda agreed that J.R. contacted her within a few days, asking if he could finish the job, but she said it would be up to her husband.

Dan testified that although he met J.R. in early 2008, it took time to negotiate down to an acceptable price for this project. He said that when they signed the contract, J.R. told him and his granddaughter that she would be swimming that summer. After excavation was underway in early September, he said J.R. demanded the second draw, but he and Brenda wanted to inspect to make sure all the necessary items were present. Dan estimated that only about 60 percent of the necessary pool-kit items were present. Dan became irritated with J.R.'s "arrogance." Dan testified that he was feeling frustrated about paying nearly $22,000 in July for work that did not begin until September and ending up with "a hole that wasn't dug right." Dan affirmed that they ended up "nose to nose," that J.R. said "I need my f* * *ing check," and that he maintained his position that when J.R. got all his "shit" out there,

Brenda would write a check. Eventually, Dan called the police and wanted J.R. to leave. Dan believed everything on site was his.

At the conclusion of the hearing, the trial judge commented that this was as acrimonious as a divorce, taking the matter under advisement. An order was entered later, in which the trial judge found that Dan breached the contract by ordering J.R. off the property, by not paying the second installment, and by not allowing completion of the contract. The order awarded J.R. damages in the amount of $19,741. This appeal followed.

Dan's arguments on appeal boil down to one essential issue: that the trial court clearly erred by not finding J.R. the breaching party, nullifying his duty to pay the second installment and any entitlement by J.R. to damages. Dan contends that he was effectively forced into demanding construction to stop by J.R.'s threatening behavior. We disagree that Dan has demonstrated clear error. This was a classic "swearing match," literally and figuratively. The trial court resolved the discrepancies in J.R.'s favor, and we affirm its decision.

It is the duty of a court to construe a contract according to its unambiguous language without enlarging or extending its terms. *Cranfill v. Union Planters Bank*, 86 Ark.App. 1, 158 S.W.3d 703 (2004). Regardless of who started the verbal altercation, the undisputed fact is that the second payment was "due upon delivery of [the] pool kit." The contract between the parties does not specifically describe the "pool-kit" items, nor does it specifically state where "delivery" of the kit must take place. The testimony from the witnesses varied on what was to be included in a pool kit and whether those items had been "delivered" as required by the contract. Undisputedly, the majority

of the pool kit was delivered to the construction site. And there was testimony to support a finding that the remainder was being held in Planit Dirt's inventory or its vehicles until the time for those components to be installed. There was testimony from which the trial court could conclude that the pool kit had been delivered as contemplated by the contract. The trial court had testimony from both sides that J.R. was refused an opportunity to finish the job, also required in the contract. This came down to a credibility call to be determined by the finder of fact, here the trial court.

As a final point, Dan takes issue with the damages assessed against him, even if he breached the contract. Dan asserts that J.R. was "out nothing." This ignores the evidence presented by J.R. of $36,000 in lost profit, which was the damage sought. J.R.'s testimony established that he typically kept his profit margin around 60% of the contract price, which here would be over $30,000 in lost profits. When a party seeks to recover anticipated profits under a contract, he must present a reasonably complete set of figures and not leave the amount to speculation. *Am. Fid. Fire Ins. Co. v. Kennedy Bros. Constr., Inc.,* 282 Ark. 545, 670 S.W.2d 798 (1984). There is less certainty required to prove the amount of lost profits than is required to show that profits were lost. *Little Rock Wastewater Util. v. Larry Moyer Trucking, Inc.,* 321 Ark. 303, 902 S.W.2d 760 (1995); *Reed v. Williams,* 247 Ark. 314, 445 S.W.2d 90 (1969); *Tremco, Inc. v. Valley Aluminum Prods. Corp.,* 38 Ark.App. 143, 831 S.W.2d 156 (1992). *See also* Howard W. Brill, *Arkansas Law of Damages* § 5–3 (5th ed.2004). Loss may be determined in any manner reasonable under the circumstances. *Tremco, supra.* J.R. was awarded $19,741, and we cannot say that the trial court clearly erred in awarding this amount.

Dan adds to his damages argument, asserting that because it was J.R., not Dan, who breached this contract, then he (Dan) should be paid back his initial payment of $21,825. Dan amplifies this argument by stating that J.R. could only be legitimately "out" some labor and fuel costs, which he could not establish with any certainty, leaving Dan with only a poorly excavated hole in the ground. Because we hold that the trial court did not clearly err in finding Dan to be the breaching party, this renders Dan's argument moot.

After our review, we are not left with a distinct and firm impression that a mistake was committed. We therefore affirm the trial court's order.

Affirmed.

MARTIN and HOOFMAN, JJ., agree.